We will begin with the first case on calendar, which is High Sierra Hikers v. Blackwell. Good morning, Your Honors. I am Pete Frost, representing the appellants, High Sierra Hikers Association. I wonder if you could keep your volume up, Mr. Frost, a little bit. I will, Your Honor. Thank you. Thank you. Hold on a second, also. We have ten showing on the clock. This is a 20-minute per side. Yeah, we switched this from the... Okay? Okay. Good morning. Ready to begin. This is Monday morning, so everybody will all get settled in here. Go ahead. Your Honors, this appeal concerns the John Muir and Ansel Adams wilderness areas in the Sierra Nevada. These areas are characterized by alpine meadows, granite peaks, and high mountain lakes. They are among the most popular wilderness areas in the country. We appeal from a district court judgment where we had challenged the Forest Service's issuance of 28 special use permits. Okay, now just clarify for me. You're representing... Appellants, High Sierra Hikers. High Sierra Hikers. Okay. Yes, Your Honor. The Forest Service had issued 28 special use permits that authorized commercial pack stock services in these two wilderness areas. These companies hire out mules or horses and guides to carry people or gear into the wilderness. And the factual basis for our challenge is that these operations significantly degrade these wilderness areas. We appeal two rulings by the district court. First, we appeal the ruling that our claim is moot that the Forest Service illegally issued the permits before determining that the amount and the type of these services are necessary and proper. And second, we appeal the district court's ruling that the Forest Service does not authorize unnecessary amounts of these use and that these uses do not illegally degrade the wilderness character. I want to touch very briefly on the facts before this court on de novo review. There are 72 trailheads that access these two wilderness areas. Well, the district court found, did she not, that there was degradation. I mean, there's no dispute that there is some degradation. I don't want to oversimplify the case, but you have what is a unique characteristic of the particular parts of this forest as a wilderness area. And the statute contemplates that this is a fairly high level of protection. The language seems to. And the district court went to great lengths to try to work out a balance between the limited usage with admitted degradation and the statutory language which provides for some uses, including recreation. So without my colleagues may want to know more about the details, but we've all read your briefs, and I think we have a good idea of what the situation on the ground is. So perhaps you could address where you think the district court went wrong along the lines that you are concerned about. Yes, Your Honor. The district court's resolution of our claim related to unnecessary amounts of use and the illegal degradation of these wilderness areas was resolved in two paragraphs, in which the district court found, decided that the Forest Service has very broad discretion under very general requirements of the Wilderness Act to balance these kinds of uses. The first reason why that is incorrect is that the Wilderness Act does not allow that kind of broad balancing of competing uses. Where is it in her ruling that you say she found broad discretion? Wait for a moment. My colleague is going to give you that. It is in her merits opinion, Your Honor. I'm afraid I don't have the page number for you. I'm not getting you right now. Excuse me. It is in her merits opinion, Your Honor. You can speak up. That's okay. And it is cited in our brief the exact page in which she found that there are very general requirements and very broad discretion. And are the differences in relief that would be afforded under the Wilderness Act as opposed to what would be afforded under NEPA? The differences are if the district court were to have found a violation of the Wilderness Act, arguably the district court would have had the discretion to authorize more aggressive relief, including the setting aside of these permits if the district court had chose to do that. What the district court did instead, having found a violation exclusively of NEPA, is to order the kind of remedial relief that this court has deemed necessary for a NEPA violation, and that is to prevent irreparable harm in the period before the NEPA violation is cured. That's different than taking the kind of proactive steps the district court had authority to do were to have found a violation of the Wilderness Act to prevent any further damage whatsoever to these areas and, for example, to have required the Forest Service to restore areas. Wouldn't that have also been available under NEPA? I think the district court has the discretion to make those kinds of rules, Your Honor. Or the same discretion under both, isn't it? Well, it is, except my understanding of this Court's rulings related to NEPA relief, I haven't seen any that specifically require an agency to take actions to restore degraded areas. What I've seen more generally from rulings of this court in NEPA relief proceedings are cases in which the court either requires the maintenance of the status quo, or in the case such as National Conservation and Parks Association v. Babbitt, requires sort of a cutback prior to the preparation of the NEPA analysis. But again, to answer your question directly, what the court could have done had it found a violation on the merits of the Wilderness Act claim is to do what the Forest Service's regulation says that the Forest Service will do in the context of encountering degraded areas, and that is to restore them. Now, Section 1131C, where it defines the wilderness area, uses language which I've found somewhat interesting. It talks about a wilderness being defined as one which is protected and managed so as to preserve its natural conditions, and which one generally appears to have been affected primarily by forces of nature, with the imprint of man's work substantially unnoticeable. And then it goes on. Now, substantially unnoticeable suggests a standard of, if you will, against which one might measure degradation. You didn't argue it that way, so I'm trying to understand how the language of the definition of wilderness plays into your analysis, because the statute goes on and provides that commercial services may be performed within the wilderness areas to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas. And given that pack animals are clearly, unless you're arguing pack animals can't be in the wilderness area at all, pack animals are going to leave a mark. And so if one were to try to manage the forest in a way where there's a standard that is in some broad discretion and is cabined by some measurement, would substantially unnoticeable be a workable standard? And if so, how would that be reconciled with the notion that recreation is one of the uses that's to be permitted within the wilderness area? So I'm trying to understand what is it? What's your standard against which a court is supposed to measure whether or not the Forest Service is managing the wilderness area in a way that's arbitrary and capricious or within its discretion? You want to narrow the discretion, so what is it? Your Honor, I think the fair reading of the language in the definitional section of the Act, which talks about substantially unnoticeable, is really talking about what these areas were or are like when they are designated as wilderness. There is no dispute that there has been pack stock use in the Sierra Nevada for decades. And in many other wilderness areas, there are other things that have occurred that have degraded the pristine nature of these areas prior to them being designated by Congress as a part of the system. But the affirmative mandate in the Act for what the agency must do when it is exercising its discretion whether to authorize a discretionary activity such as commercial services is to do so only when authorizing those services is consistent with its mandate to protect and restore the natural character of the river. How does one make that on-the-ground assessment? Pack animals are going to leave trails and manure, and so what's the level at which we say a court should intervene and say that the Forest Service isn't doing its job properly? And they've been doing that very thing since John Muir's time. That's correct, Your Honors. That's correct, Judge Gibson. There have been historic pack uses in these areas for decades. However, where Congress has intended an historic use to be continued relatively unabated, despite the mandates of the Wilderness Act, it has specifically accepted those kinds of activities from the protective mandates. The two activities that the Act specifically grandfather clauses is livestock grazing and certain kinds of motorboat use. Had Congress intended these same uses to continue at a level of degradation, it would have specifically said so, and it did not. Would the district court have had the same discretion to do what the district court did in this case had it been ruling under the Wilderness Act? I'm sorry, Your Honor, I don't understand your question. Right now, the district court said, look, we've got to do an EIS to evaluate what the effect of these commercial services is on the wilderness area. Could the district court have done exactly the same thing were it evaluating under the Wilderness Act? Yes, Your Honor, I think it is within the court's discretion to have required the agency to prepare a cumulative impact EIS. Or to say before we make any change one way or the other that we do an EIS or an evaluation. The reason I'm asking that is if this case were to be remanded as you contend it should be, wouldn't the district judge do exactly the same thing as the district judge did in this case, acknowledging that there is a question about the effect of these commercial services and evaluating whether they're excessive or not? With respect, Your Honor, no. I think the district court, if this court were to decide that the district court erred in its interpretation of the Wilderness Act and were to set forth a standard for how agencies must manage these lands under that act and remand it, then the district court's responsibility would be to look at the administrative record in this case that was before the agency at the time it issued these special use permits and determine whether the decision maker's decision was arbitrary and capricious or not in light of this court's ruling. And if the district court were to decide on remand that the agency violated the act, the district court, again, has relatively broad discretion on relief as compared to on the merits to remedy what it finds to be a violation of the law. I still am fishing. Maybe I missed it. I still don't understand. You say if this court, this three-judge panel of the Ninth Circuit were to articulate a standard  Well, I think the standard is plain, in our view, in the management provisions of the Wilderness Act. It requires the agency to, at minimum, protect and restore the natural features of these wilderness areas. They say they're doing that. They say that that's what we're doing. You reject the notion that it has to be brought back to a standard which is, you know, basically untouched by or the imprint of man is negligible. So they're saying we're looking at it, we're balancing it. The statute provides for commercial services to implement recreational uses. People who cannot hike these trails would use pack animals. As Judge Gibson noted, they've been doing it for decades. You've acknowledged. I'm at sea here, mixing my geography, but being quite serious. How would we fashion a standard that says now they haven't imposed enough restrictions? With respect, Your Honor, the Forest Service's arguments in the district court and here are not that commercial pack stock operations protect and restore degraded conditions in the wilderness areas. Their argument is, as you noted, we are balancing competing uses and this court should countenance the kind of degradation that is evidenced in this administrative record and find that the statute is ambiguous as to our management duties. So what do you do with the commercial services provision that says that commercial services may be performed within the wilderness area to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas? How can you have recreational use with pack animals that isn't going to, in some measure, degrade the natural state? The Forest Service never made the determination before issuing these permits that the extent of use that it is authorizing is either necessary or proper in these wilderness areas. But you want a finding from the Forest Service to say this is why we think the recreational usage of extending these permits and allowing the amount of pack animal travel or usage is consistent. You want something specific in the record reflected in the analysis of the Forest Service. Right. And Judge Hugg's question to you was, if we adopt that standard, what would be different from what is supposed to be happening under the EIS that's been ordered under the NEPA provisions? What would be different is we would be, if the court were to find, as we urge that it does, that these are predicate determinations that must be made before the services are authorized, we could be in the position of challenging those determinations. What has happened here is the permits were issued. So you want this, you want the activity to stop pending all of this. Is that what you're saying? So, you know, our clients have never sought to have this activity completely stopped. You know, our clients recognize that there is perhaps some amount and type of commercial service that is legitimate for these wilderness areas, and indeed the needs assessment that the agency did perform belatedly after some re-judgment in this case recognizes that there are two discrete groups of people for whom these commercial services are needed, special populations and those who are unable to carry their own equipment. But what has happened on the ground is that there is no link between those findings and what is occurring. And what is occurring is able-bodied people using very large groups of pack stock to carry a lot of equipment into the wilderness area and the resulting degradation of the wilderness area. Who should do this balancing? The Forest Service at the outset should be doing this balancing. Well, isn't that what's going to happen under NEPA? I anticipate and hope that if they perform the cumulative impacts EIS and this court upholds the remedial order of the district court, that there will be the agency will deal with these issues. But that doesn't vitiate our right to have the district court address this on summary judgment rather than finding that the claim was moved. You then think that the district court should be the one that's doing this balancing? I think the district court can appropriately defer to an agency that has done the balancing prior to issuing the permits. Well, suppose that they don't defer to what they have done but feel that there should be an additional balancing. Are you saying the district court should do this balancing itself? I think the district court needs to determine whether the agency did the balancing before authorizing the use. I think it's determined that it didn't and that that's why an EIS. So my question is, is it seems to me you've won and it's going to be balanced. And I'm not sure why you're pressing forward on the Wilderness Act when the Forest Service is going to be required to do this balancing. And clearly there could be some commercial services. Why not let that procedure go ahead? We're pressing forward on the Wilderness Act because of the precedential nature of the district court's decision on the merits. But this act, which we view does not countenance the kind of balancing the agency says that it does, is going to have an effect not only for these two wilderness areas but other wilderness areas throughout the country. The fact is essentially what you're talking about is the effect, the precedential effect. That's what you're worried about. Of the court's determination on the merits in the light of the administrative record in this case, it would be difficult to find a quantum of damage as significant as the damage that the district court itself recognized exists here. The fact that the balancing is going to be done underneath by the Forest Service in this case is not enough for you because you want a precedent under the Wilderness Act, is that it? Your Honor, if the Forest Service goes into the environmental assessment process with the wrong interpretation of what it must do under the Wilderness Act, then what comes out the other side of that process is going to be wrong. Well, there really is no ruling by the district court one way or the other on the Wilderness Act. The district court just said it's moot because the same kind of evaluation is going to take place under the EIS with the Forest Service evaluating this, acknowledging that they have not complied thus far. And so under EIS, the Forest Service is going to be doing the very thing you want them to do. Your time is up. May I answer the question? You can answer that question. Judge Gibson, if you have a question after he's done answering this one, please sing out. Otherwise, his time is up. Okay, I have no questions. Go ahead. With respect, Your Honor, the district court did not find the Wilderness Act claim moot. The district court ruled against us on the merits of the Wilderness Act claim. And in two paragraphs said this act has very broad guidelines and gives the agency very broad discretion. And in both respects, we think Congress intended otherwise with the Wilderness Act. So there was a merits decision that is going to dictate when the Forest Service goes into the EIS process what it considers to be its appropriate role in managing these areas. And we urge that it is to protect and restore the primeval and natural conditions of these areas. Just one question. What if we were to find that it is moot? The Wilderness Act claim? I don't know how the court could find that it's moot. Well, if the same thing is going to be accomplished in this case under NEPA, then what difference does it make for the Wilderness Act? And why isn't it moot? Your Honor, in our view, unless this court clarifies what the substantive law is for the agency prior to going into the NEPA process, then we're not going to come out of that process with a result that is consistent with the act. We're going to come out of that process with a result that's consistent with what the agency has done before, which is to violate it. Thank you. Okay. May it please the Court, I am David Shilton. I am representing the federal appellees. I intend to take 15 minutes and give five minutes of my time to the interveners, Mr. Dinan and Mr. Dix. And if you could speak up just a little more, I would appreciate it. Certainly, Your Honor. I intend to cover this point. And you'll have to watch your time. I'll try to remind you, but do watch. Sure. Thank you. I intend to cover, first, whether the magistrate had APA jurisdiction over the Wilderness Act claims, and second, whether there was either a procedural or substantive violation of the Wilderness Act, and third, on our cross-appeal, whether the magistrate erred by requiring the Forest Service to complete a separate NEPA process on cumulative impacts throughout the two wilderness areas. On the jurisdictional question, this challenge was filed in 2000, when the Forest Service was in the midst of an administrative process for coming up with a wilderness plan for these two wildernesses and an EIS for that wilderness plan. That plan issued in 2001, shortly before the magistrate made her decision on the summary judgment motions. But this suit is not a challenge to that 2001 wilderness plan and EIS. And by the way, the EIS is volume two of our supplemental excerpts of record. This suit, we believe, was a programmatic challenge to the Forest Service general management of these two wilderness areas over an extended period. But didn't they challenge actual SUPs? I mean, they weren't making just a general challenge. They were talking about issuing permits to specific packers. To some extent, they did. Certainly, their NEPA challenge was to specific special use permits, and we have no issue with the jurisdiction over the NEPA challenges. Now, with respect to the Wilderness Act challenges, they maintain in their brief that their Wilderness Act challenges also challenge those special use permits. But I don't think that's actually correct. If you look at their complaint, their complaint does not tie the alleged Wilderness Act defects to particular permits. They simply focus on the state of the wilderness itself and argue that the Forest Service is permitting too much use of the wilderness in general without tying it to particular decisions on special use permits. And we believe that's the sort of programmatic challenge that's not allowed under National Wildlife Federation versus Lujan. And the fact that counsel, in response to your question, said that the relief under a Wilderness Act claim would be to direct the Forest Service to restore areas of the wilderness, I think just confirms the programmatic nature of their challenge. An APA challenge, the relief would be setting aside an agency decision, such as a special use permit. But that is not the relief that they're seeking under their Wilderness Act claims. They're seeking this court to basically direct certain things to happen on the ground. And we think that's beyond a court's APA jurisdiction. Has the Forest Service really done a needs assessment? Yes, it has. In what way? Well, in the 2001 EIS, there is a 40-page needs assessment. It's called Appendix D to the EIS. Appendix D is actually in the excerpts of record of the appellants. And in that, it assesses the need for commercial services of all types, both packer services and guide services. But it really didn't take into account what the damage was. It just said, historically, that's what's happened, and therefore we're approving a historical commercial use. The service day allocations that are approved in that Appendix D are actually somewhat lower than they were, but they are based on the historic use of these packers. But the Forest Service found that. Is that enough if there's been considerable damage, as the district court found, requiring an EIS? Well, the district court said that there was evidence of impacts and pointed to eight or nine instances where the plaintiffs had found ranger reports from over the past ten years where rangers had said, look, there's a problem in this meadow or there's a problem on this trail. But this goes to our jurisdictional challenge. We think the problem with allowing plaintiffs to basically pick and choose items from the record over the past ten years is it doesn't give a complete or comprehensive picture of what the real state of the wilderness is. It's like having ten years of your snapshots and picking out the worst ten. The only comprehensive view and analysis of what the state of the wilderness is, is in the 2001 Wilderness Plan EIS. And that is not being challenged here. There's actually been a challenged file to that in the D.C. District Court by the packers, but no challenge yet, anyway, by environmental groups. But that 2001 EIS, and I hope the court has a chance to look through that, really studies the state of the wilderness area. It finds that there are some areas that have been impacted by use, and it takes provisions to make sure that those areas are restored. But it doesn't present that picture that you might get just looking at that one statement by the district court of there being a disturbing trend here. So we think the magistrate's statement that there is evidence that was disturbing is somewhat overblown. But in any case, her statement was not a finding. I mean, this was not a trial. It was simply a statement that plaintiffs had introduced some evidence of some impacts. So we think, at least on those Wilderness Act claims, that there is a jurisdictional problem. But even if there is jurisdiction, we think the district court was certainly correct to dismiss those claims. Can I just understand, then? I had understood that the way the Forest Service extended these SUPs was based on historical usage. And you're saying that the 2001 Wilderness Plan EIS actually looks at a broad picture and factors all of that in on an individualized basis in some fashion? It does factor it in, but it establishes service day allocations for each of the PAC stations. But a further individualized look will be taken when the Forest Service issues the new special use permits for each of the PAC stations, which it will be doing. What standard will the Forest Service apply in doing that? Well, it will have to consider its general mission under Section 1133 to provide use and enjoyment of the wilderness while at the same time preventing impairment of the wilderness. Is that any different from any other permitting it does for non-wilderness areas? I would say that the direction in the wilderness area is stricter as far as protectiveness than in non-wilderness areas. But it still involves a balancing because it does say that wildernesses are for use and enjoyment of the public while preserving wilderness character. But certainly, as has been pointed out, having PAC horses in a wilderness area is consistent with wilderness character. They've been there since long before the wildernesses were formed. So what the Forest Service has to do is make sure that impacts, which do happen from use, whether it's by hikers or horses, that they don't become impairment. So they have these annual plans for the packers each year, which have conditions to make sure that the meadows aren't overgrazed and the trails aren't cut, and they monitor them. And if there's been a problem, they enforce. And in the record we put in our excerpts of record as attachments to the affidavit of Mr. Bramlett, there's a number of instances showing where the Forest Service has said, well, we found a problem here with overgrazing, and you're going to now have to pack in your feed for these stock. So the thrust, one of the major points, as I understand the plaintiffs are complaining about, is that these permits have been used to essentially run the able-bodied hiker permit system, which is to be a gateway toward getting into the wilderness area. And, in fact, what they're doing is using the packers as a way of getting onto the trail when they couldn't get on the individual hiker use permit. And that brings not only the hikers, but it brings a whole boatload of animals along with them. So what is it that the Forest Service does to screen out that kind of activity if it happens? Well, I think the question is, if that activity happens, how does the statute treat it? Is there something inherent in a person who might backpack deciding, well, I might have a better chance at getting a wilderness permit if I hire a packer? Is there anything contrary to the statute in them doing that? And I don't think there is. Well, what's the purpose of the Wilderness Act then? Well, I mean, the idea is to prevent and keep degradation and keep it pristine above and beyond, you know, Sequoia National Park. You drive through General's Highway and you get off and you walk through and you've got animals there. But that's not the wilderness area. So the wilderness area, presumably, Congress has something in mind when it described it and put these restrictions in which says, only as necessary to further the recreational use. There's got to be some meaning to that language, isn't there? There is. Certainly, commercial services may be performed to the extent necessary for activities that are proper for realizing recreational purposes. Hiking into the wilderness is proper. Taking a horse back into the wilderness, those are all proper activities. But what's the purpose then of putting it? If people are resorting to pack animals because they can't get an individual permit, why wouldn't the Forest Service be increasing the number of hiker permits rather than forcing them into a situation where they're simply bringing pack animals along to jump the line or get around the restriction on the individual hiker permit? Well, the Forest Service limits both. I mean, they limit the hiking permits. I understand that. This is really an allocation question between the two groups, and the 2001 wilderness plan works at making those allocation decisions, which are a tough one. But the Forest Service really doesn't have an administrative means for checking on the motives of any particular customer who shows up at the packer and says, you know, I'd like to hire some horses to take my stuff back in the wilderness. And so I think it would be administratively impossible, but also not required by any statute or regulation for the Forest Service to, in effect, have a test for everybody who goes to a packer and says, you know. But wouldn't this be an indication with what the evidence has been adduced, an indication that the packing requirements are too high, or too high in comparison to the individual hiking? And as you answer that, please answer the question, but you're well into your confederates' time. Oh. Well, actually, I think I have a couple of minutes since I've allocated five to them. I'm sorry, you're right. To answer your question, there's been no evidence that, you know, this is a significant amount of the use that goes to packers, you know, people who decide, well, I'll use the packers because I can't use the wilderness permit. There is anecdotal evidence that it has happened in the past, but no evidence that this is a significant problem. But I think more fundamentally, the statute doesn't require the Forest Service to make those kinds of motive determinations as to why people. You know, I understand it wouldn't get into motive, but in terms of volume of usage, it seems to me that there's some kind of role that they would play. And if they simply go on historical bases, they aren't looking at the nature of their use. And the statute does contemplate it has to be reasonably related to the recreational purposes. So there's got to be some purpose determination inherent in that assessment. Fair enough. But I think recreational purpose is pretty broad, and it would include somebody going back with a horse who could hike in if they were able or. So I don't think that a recreational purpose would exclude the person who is just doing it because they think it may be easier to get a permit that way. Do you disagree with this court's finding that the Forest Service failed to institute an EIS before issuing multi-use permits? No, we don't. Multi-year use permits. No, we don't disagree. We never argued that it was proper. You should have done it. We should have done a NEPA process on the term special use permits, and we didn't, except for two. And that was an error. We're correcting it. In the 2001 EIS, it announced a schedule for doing individual NEPA analyses on the permit renewals that are coming up, and they're working on that now. And that's a one-year renewals as well. Well, the one-year renewals are just temporary to get them through this period, but the analyses are going to be done on the long term because that's the important one. But our problem with the only problem we have. But you could continue to give a whole bunch of one-year renewals that would affect us substantially. Well, the district court has allowed the Packers to stay in operation during. No, I understand that. But are all the use permits going to be multi-year use permits that are eventually granted? Traditionally, the special use permits for Packers have been from 10 to 20 years, and I think that would be in the contemplation. My problem is that you could, under your view, you could continue granting one-year renewals, and never look into the aspect of what damage is being done to the wilderness. I see. I mean, we certainly would not think that that is an appropriate approach, and we're doing the analyses that the judge required. We're not going to just do one year by year. We simply need a little time to do the necessary analyses because you've got to get up into the high country, do a couple years of studies to see what the condition is of the various areas, and that's what we're doing now. Our problem with the district court's order, though, was just ordering the separate cumulative impacts analysis. We find no precedent in NEPA for a separate NEPA process just on cumulative impacts. Cumulative impacts will be handled with each specific permit NEPA process, and we think that's a violation of the CLEPI case in the Supreme Court and Jones v. Gordon from this court. I don't want to take any more of my time. Okay. Judge Gibson, Mr. Shilton's about to wind up. Did you have any questions? No, I have none further. Okay. Thank you. Good morning, Your Honors. My name is Donald Dinan, and I represent the National Forest Recreation Association and the Westside Packers. In the few moments that I have, because I want to reserve a minute to my brethren, Mr. Dix represents the Eastside. I wonder if you could speak up, counsel. Yes, Your Honor. Thank you. I would like to address the one issue that I believe Judge Huggins' last question brought up, and that is the use of the categorical exclusions for the one- or two-year extension of the current permits. Without the restriction put in the injunction, we would submit that the court erred in not allowing the Forest Service to use the categorical exclusions. Again, it's limited to one-to-two years under Forest Service regulations, 40 CFR Sections 1507 and 1508. The use of categorical exclusions is specifically provided for by the Forest Service regulations for the continuation or modification of a permit, and that use has been upheld by this court in Alaska Center for the Environment versus the Forest Service cited in our brief. Further, this court and the Forest Service regulations have specifically provided that categorical exclusions can be used in a wilderness area, that the fact that it's a wilderness area does not exclude the use, and in this regard we think that the court below erred in finding to the contrary. What you contend should be the categorical exclusion? What we would contend is the categorical exclusion, which is what was being used, should be the continued use under the permit while the EA is being done to determine what the appropriate use should be, and that the injunction limiting the use should not have occurred while that one-to-two year period was in effect. And we think that there was scoping done on the use of the categorical exclusions, and this court has consistently held the standard is arbitrary and capricious, and we do not believe that it was unreasonable for the Forest Service to determine that the categorical exclusions couldn't be used for the one-to-two years. Unless there are any questions, I'd like to give this to Dix the last moments. If you may. Good morning, Your Honors. My name is John Dix, and I represent the west side unit. Mr. Dining got that a little bit reversed. His folks are on the east side. Mine are on the west side. You're on the snowy side. You're on the sunny side. Well, you know, Bishop, there's a great event that happens here in a little bit that's been going on for quite a few years. You have a minute, so I'll give you some of your time. There are three PAC stations in particular I represent, High Sierra, DNF, and Yosemite. Now, I'd like to draw your attention to the fact that the facts are different with Sierra National Forest than there are within you, National Forest, as to NEPA. Two of these PAC stations, High Sierra and DNF, actually had EA's environmental assessments done under NEPA before their permits were issued. They just seem to have gotten dragnetted into this thing and drug along, but the facts in their situation is different. The district court did exempt them from the allocation reduction it imposed in the injunction, but the rest of the injunction, it applied to them. Now, NEPA requires that there be environmental factors looked at if there's a major federal action. The other PAC station I represent, Yosemite Trails, actually only passes through the Ansel Adams Wilderness for a short distance on its way into Yosemite National Park, and it holds permits for both. It would seem simply passing through a wilderness ought not to be considered a major federal project under NEPA. So we'd ask you to take a particular look at that, and see if you can't reverse the lower court as it applies to the westside packers in Sierra National Forest. Thank you. All right. Thank you very much. The case just argued will be submitted. We thank counsel for the very informative argument.
judges: Hug, Gibson, Fisher